Implus Footcare, LLC v. Vore, 2026 NCBC 34.

STATE OF NORTH CAROLINA

WAKE COUNTY

IMPLUS FOOTCARE, LLC,

               Plaintiff,

v.

TODD VORE, BLUE SAN, LLC, H.B. SHOES CO., THE MIKE HALE COMPANY, RICHARD CHANG, MERRICK JONES, MATTHEW CARTER, and SHARON FAN,

               Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
24CV020659-910

**ORDER AND OPINION ON PLAINTIFF'S MOTION FOR PARTIAL JUDGMENT ON THE PLEADINGS**

**THIS MATTER** is before the Court on Plaintiff Implus Footcare, LLC's Motion for Partial Judgment on the Pleadings ("Motion," ECF No. 186).

Having considered the Motion, the parties' briefs and other submissions, the applicable law, and all other appropriate matters of record, the Court concludes that the Motion should be **DENIED** for the reasons set forth below.

> *Kilpatrick Townsend & Stockton LLP, by Jason Wenker, Richard Self, Joseph Gadberry, and Elisabeth Briand, for Plaintiff Implus Footcare, LLC.*
>
> *Foley Hoag LLP, by Kristyn DeFilipp, Jasmine Brown, and Rachel Kerner, and Morningstar Law Group, by Harrison Gates, for Defendants Todd Vore, Blue San, LLC, Richard Chang, Merrick Jones, Matthew Carter, and Sharon Fan.*
>
> *Morningstar Law Group, by Harrison Gates, for Defendants H.B. Shoes Co. and The Mike Hale Company.*

Davis, Judge.

## INTRODUCTION

1.    This action began its existence as a relatively straightforward lawsuit brought by two related companies against a sole defendant. Since then, it has

morphed into a sprawling mass of new claims and counterclaims, resulting in the addition of seven additional defendants and a wealth of new legal theories of recovery. The case now primarily involves claims by two competitors in the footwear accessories and shoe care products industry (Implus Footcare, LLC ("Implus") and Blue San, LLC ("Blue San")) who accuse each other of engaging in various forms of anti-competitive and tortious conduct designed to harm the other's standing and reputation in the industry. In the present Motion, Implus seeks the entry of judgment on the pleadings in its favor with regard to a counterclaim asserted against it by Blue San for unfair and deceptive trade practices ("UDTP"). More specifically, Implus seeks the dismissal of some (but not all) of the enumerated *bases* for the UDTP counterclaim as set out in Blue San's most recent pleading.

**FACTUAL AND PROCEDURAL BACKGROUND**

2.     The Court does not make findings of fact when ruling on a motion for judgment on the pleadings under Rule 12(c) of the North Carolina Rules of Civil Procedure and instead recites only those allegations in the relevant pleading that are necessary for the Court's determination of the motion. *See, e.g., MarketPlace 4 Ins., LLC v. Vaughn*, 2023 NCBC LEXIS 31, at \*2 (N.C. Super. Ct. Feb. 24, 2023).

3.     The Court sets out below those facts alleged by Blue San in its Second Amended Counterclaims ("Counterclaims," ECF No. 178) that are most relevant to the present Motion.[1]  A more thorough recitation of the factual and legal issues previously addressed by the Court can be found in its prior orders and opinions in

---

[1] Not surprisingly, the bulk of these allegations are hotly contested by Implus.

this case.  *See, e.g., Implus Footcare, LLC v. Vore*, 2025 NCBC LEXIS 121 (N.C. Super. Ct. Sept. 11, 2025).

4.      Implus is a Delaware limited liability company with its principal place of business in Durham County, North Carolina.  (Countercls. ¶ 2.)  Implus is primarily in the business of designing and distributing footwear accessories and shoe care products.  (Countercls. ¶ 10.)

5.      Defendant Todd Vore was employed by Implus for more than twenty years and served as its president from 2000 to 2020.  (Countercls. ¶ 14.)  However, in early 2020, Vore resigned from his position as Implus's president and terminated his employment.  (Countercls. ¶ 14.)

6.      That same year, Vore joined with two former Implus employees, Defendants Richard Chang and Merrick Jones, to form Blue San.  (Countercls. ¶¶ 5, 12–13.)

7.      Blue San is a North Carolina limited liability company with its principal place of business in Durham County, North Carolina.  (Countercls. ¶ 1.)  Blue San designs, develops, and distributes various consumer products, including home furnishings and décor, beach accessories, footwear accessories, and shoe care products.  (Countercls. ¶ 5.)

8.      In late 2023, Vore began working for Blue San as its Director of Sales, Marketing, and Operations.  (Countercls. ¶¶ 6–7.)  Shortly thereafter, Blue San started expanding its business to include footwear accessories—such as premium footwear insoles and socks—and shoe care products.  (Countercls. ¶¶ 5, 18–20.)

9. Beginning in early 2024, Blue San began hearing market "chatter" that Implus was struggling to fulfill its contractual obligations with retailers in the "Specialty-Family Channel" segment of the market—which is comprised of "smaller stores that specialize in footwear and sports gear, and related accessories for the whole family." (Countercls. ¶¶ 19, 42.)

10. Specifically, Blue San learned that Implus was experiencing delays in delivering—or had failed to deliver altogether—certain products to Specialty-Family Channel retailers, which resulted in those retailers losing out on sales. (Countercls. ¶ 43.)

11. Blue San was also made aware that Implus had begun marketing and selling its premium brands—which it had historically sold exclusively through Specialty-Family Channel retailers—to "big-box" retailers in other segments of the market, including at Walmart, CVS, Walgreens, and Costco. (Countercls. ¶¶ 44–45.) Given the importance of brand integrity in the market, Specialty-Family Channel retailers repeatedly expressed their concerns to Blue San about Implus's "brand dilution" affecting their ability to compete with "big-box" retailers. (Countercls. ¶¶ 46–47.)

12. Around that same time, in February 2024, Blue San entered into contracts with two of Implus's former sales representatives—Hugh Bates and Mike Hale—via their respective companies, Defendants H.B. Shoes Co. and The Mike Hale Company ("Blue San Agreements"). (Countercls. ¶¶ 21–22, 29–31.)

13. Throughout the following months, Blue San, Bates, and Hale continued to hear rumors that Implus was struggling in the market as representatives for various Specialty-Family Channel retailers complained of poor order fulfilment rates, late deliveries, defective products, and increasing prices. (Countercls. ¶¶ 49–51.)

14. By June 2024, Blue San was in the advanced stages of entering the footwear accessories and shoe care products market—having developed product designs, completed sales pitch decks, and scheduled meetings with prospective customers. (Countercls. ¶¶ 39, 59.)

15. Blue San alleges that around this time—after learning of Blue San's progress—Implus concocted a scheme to prevent (or at least delay) Blue San from fully entering and competing with Implus in the market. (Countercls. ¶¶ 59, 67.)

16. Blue San's Counterclaims allege that Implus's scheme first became apparent when Implus's Vice-President of Account Strategies, Ken Linden, approached Bates and Hale at a Fashion Footwear Association of New York conference and offered to pay them a "bribe[ ]" of between $1,000 and $1,500 per month if Bates and Hale would terminate their relationship with Blue San. (Countercls. ¶¶ 68–71.)

17. Though Bates and Hale immediately rejected Linden's offer, they—through their respective companies—eventually did enter into new agreements to serve as sales representatives for Implus on 17 June 2024 ("Implus Agreements"). (Countercls. ¶¶ 71–81.)

18. However, within forty-eight hours of signing the Implus Agreements—and before they had actually performed any work for Implus—Bates and Hale "realized" that they had made a mistake and provided Implus with oral and written notice that they would not adhere to the Implus Agreements. (Countercls. ¶ 82.)

19. Implus responded by engaging in conduct designed to prevent Bates and Hale from working with Blue San—which ultimately resulted in Bates and Hale "cut[ting] ties" with Blue San for several months during a critical time in Blue San's development. (Countercls. ¶¶ 83–85.)

20. Implus then began seeking to coerce Vore into discontinuing his relationship with Blue San—going as far as filing the initial Complaint ("Vore Complaint," ECF No. 3) in this action as a pretextual "sham," which it has used to intimidate Vore, Chang, Jones, Bates, Hale, and Blue San's prospective customers. (Countercls. ¶¶ 86–89, 91–94, 98.)

21. As part of Implus's ongoing anti-competitive scheme, Blue San alleges, Implus has made unreasonable and unlawful demands that Vore, Bates, and Hale not compete with or disparage Implus. (Countercls. ¶ 95.)

22. Implus initiated this action by filing the Vore Complaint in Wake County Superior Court on 2 July 2024.

23. This case was designated as a mandatory complex business case on that same day and was subsequently assigned to the undersigned on 3 July 2024. (ECF Nos. 1–2.)

24.     Blue San filed the Counterclaims on 15 December 2025, in which it asserted various claims for monetary relief against Implus, including, *inter alia*, the UDTP claim presently at issue.

25.     Implus filed the present Motion on 15 January 2026.

26.     Having been fully briefed, the Motion is now ripe for resolution.[2]

## LEGAL STANDARD

27.     "A [Rule 12(c)] motion for judgment on the pleadings is the proper procedure when all the material allegations of fact are admitted in the pleadings and only questions of law remain.  When the pleadings do not resolve all the factual issues, judgment on the pleadings is generally inappropriate." *Ragsdale v. Kennedy*, 286 N.C. 130, 137 (1974) (cleaned up).  "A complaint is fatally deficient in substance, and subject to a motion by the defendant for judgment on the pleadings if it fails to state a good cause of action for plaintiff and against defendant." *Bigelow v. Town of Chapel Hill*, 227 N.C. App. 1, 3 (2013) (cleaned up).

28.     When ruling on a motion under Rule 12(c), the Court may only consider "the pleadings and exhibits which are attached and incorporated into the pleadings." *Davis v. Durham Mental Health/Dev. Disabilities/Substance Abuse Area Auth.*, 165 N.C. App. 100, 104 (2004) (cleaned up).  The Court must "view the facts and permissible inferences in the light most favorable to the nonmoving party." *Ragsdale*, 286 N.C. at 137.  "All well ple[d] factual allegations in the nonmoving party's

---

[2] In the exercise of its discretion, the Court elects to rule on the Motion without a hearing. *See* BCR 7.4 (stating that "[t]he Court may rule on a[ny] motion without a hearing").

pleadings are taken as true and all contravening assertions in the movant's pleadings are taken as false. All allegations in the non-movant's pleadings, except conclusions of law, legally impossible facts, and matters not admissible in evidence at the trial, are deemed admitted by the movant[.]" *Id.* (cleaned up).

## ANALYSIS

29. To establish a *prima facie* claim for UDTP, a claimant must show "(1) the defendant committed an unfair or deceptive act or practice, (2) the action in question was in or affecting commerce, and (3) the act proximately caused injury to the plaintiff." *Gen. Fid. Ins. v. WFT, Inc.*, 269 N.C. App. 181, 191 (2020) (cleaned up).

30. In its Counterclaims, Blue San bases its UDTP claim on the following ten separately enumerated acts allegedly committed by Implus:

(1)  bribing Bates and Hale, in the form of a monthly payments [*sic*], to cease and refrain from working for Blue San in furtherance of its anti-competitive scheme against Blue San;

(2)  intentionally and for anti-competitive purposes, inducing Bates and Hale to violate their Blue San Agreements and cease their work for Blue San;

(3)  stopping Bates and Hale from working for Blue San by any means necessary, including by making threats of litigation against them based on unenforceable provisions of the Implus Agreements;

(4)  suing Vore;

(5)  using the Vore Lawsuit to harass, intimidate, and unfairly restrain Vore's activities in furtherance of its anti-competitive scheme against Blue San;

(6)  using the Vore Lawsuit and subsequent amendments thereto to disrupt Vore's relationship with his business partners, and to intimidate them out of [sic] working with Vore;

(7)     making inaccurate and/or misleading statements about the litigation to prospective Blue San customers to deter those customers from placing orders with Blue San;

(8)     seeking to impose restrictive covenants on Blue San's principals, when their restrictive covenants with Implus expired years prior;

(9)     demanding vague assurances that are broader than any relief Implus ultimately seeks by this litigation; and

(10)    selectively interpreting its agreements with its manufacturers to block Blue San from working with those manufacturers.

(Countercls. ¶ 128.)

31.     In the present Motion, Implus seeks an order from the Court ruling that seven of those acts—as alleged—cannot give rise to UDTP liability for essentially three reasons.

32.     First, Implus argues that the *Noerr-Pennington* doctrine[3] serves as a bar to any portion of Blue San's UDTP counterclaim based on Implus filing or maintaining the present action in an effort to harass or intimidate Vore (or anyone else) from working with Blue San.  Second, Implus contends that the so-called "learned profession" exemption[4] to North Carolina's Unfair and Deceptive Trade

---

[3] The *Noerr-Pennington* doctrine provides that "a party who seeks redress by filing a lawsuit is immune from claims that are based *solely* on the pursuit of that lawsuit." *Velocity Sols., Inc. v. BSG Fin., LLC*, 2016 NCBC LEXIS 19, at *15 (N.C. Super. Ct. Feb. 22, 2016) (emphasis added) (cleaned up); *see also Found. Bldg. Materials, LLC v. Conking & Calabrese, Co.*, 2024 NCBC LEXIS 40, at *15–17 (N.C. Super. Ct. Mar. 4, 2024) (holding that the *Noerr-Pennington* doctrine is applicable to claims for UDTP).

[4] The "learned profession" exemption immunizes a defendant from UDTP liability where: (1) "the person or entity performing the alleged act [is] a member of a learned profession[;]" and (2) "the conduct in question [involves] rendering of professional services." *Sykes v. Health Network Sols., Inc.*, 372 N.C. 326, 334 (2019) (cleaned up); *see also Moch v. A.M. Pappas & Assocs., LLC*, 251 N.C. App. 198, 207 (2016) (holding that the learned profession exemption applies to professional services rendered by attorneys).

Practices Act precludes Blue San's UDTP claim to the extent it is based on communications sent by counsel for the parties. Third, Implus asserts that several of the acts referenced by Blue San in support of its UDTP counterclaim did not proximately cause any actual injury to Blue San.[5]

33. Having thoroughly considered the Motion, Blue San's Counterclaims, and the parties' respective briefs in support of and in opposition to the Motion, the Court finds that Implus's arguments are not well suited for disposition at the Rule 12(c) stage and that the Court would greatly benefit from a more fully developed factual record before addressing the parties' arguments. *See I-Mins. USA, Inc. v. Zielke*, 2015 U.S. Dist. LEXIS 123686, at *10 (W.D.N.C. Sept. 16, 2015) (concluding that "dismissal based on the assertion of the *Noerr-Pennington*" doctrine was "inappropriate" at the Rule 12 stage); *DiCesare v. Charlotte-Mecklenburg Hosp. Auth.*, 2017 NCBC LEXIS 33, at *57 (N.C. Super. Ct. Apr. 11, 2017) (denying a motion for judgment on the pleadings "without prejudice to [d]efendant's right to raise [the learned profession exemption] in later motion practice based on a more developed factual record[ ]"); *Boyce & Isley, PLLC v. Cooper*, 153 N.C. App. 25, 37 (2002) (reversing the trial court's dismissal of a UDTP claim and holding that "[i]t will be plaintiffs' substantial burden, as this case progresses, to provide sufficient evidence to support their claim that they have suffered actual injury as a result of defendants' actions[;] [a]t this juncture, however, they are entitled to proceed with their claims").

---

[5] *See, e.g., McLamb v. T.P. Inc.*, 173 N.C. App. 586, 593 (2005) (affirming dismissal of a UDTP claim where the plaintiff failed to "allege any damage by virtue of defendant's alleged unfair and deceptive acts[ ]").

## CONCLUSION

**ACCORDINGLY**, Implus's Motion for Partial Judgment on the Pleadings is

**DENIED**.

**SO ORDERED**, this the 15th day of April 2026.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases